NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13399

COMMONWEALTH  vs.  ELVIO J. MARRERO.

Franklin.      October 4, 2023. - January 12, 2024.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.

Homicide.  Deoxyribonucleic Acid.  Practice, Criminal,
    Postconviction relief, New trial.

Indictment found and returned in the Superior Court
Department on December 7, 1994.

Following review by this court, 427 Mass. 65 (1998), a
motion for a new trial, filed on April 14, 2020, was heard by
Michael K. Callan, J.

A request for leave to appeal was allowed by Lowy, J., in
the Supreme Judicial Court for the county of Suffolk.

Ira L. Gant, Committee for Public Counsel Services (Lauren
V. Jacobs also present) for the defendant.
Bethany C. Lynch, Assistant District Attorney, for the
Commonwealth.
The following submitted briefs for amici curiae:
Jessica Lewis & Joshua M. Daniels for American Civil
Liberties Union of Massachusetts & another.
Andrew Shear, Hannah Freedman, & Natalie Baker, of New
York, Stephanie Roberts Hartung, John P. Bueker, & Scott S.
Taylor for Innocence Project, Inc., & another.

Martin W. Healy, Thomas J. Carey, Jr., & Donna Jalbert Patalano for Massachusetts Bar Association.

LOWY, J.  When he was arrested for the murder of Pernell Kimplin, the defendant Elvio Marrero had with him a distinctive black leather jacket.  Police testing discovered blood inside the sleeves of the jacket, and, due to the small quantity of blood, the forensic tests performed could not exclude the victim as a source of that blood.

At trial, numerous witnesses testified that they saw the defendant wearing the jacket on the day of the murder. Crucially, the first witness that interacted with the defendant after the victim's death testified that she saw the defendant with blood on his hands and arms, wearing that same jacket.  In its closing argument, the Commonwealth linked the bloodstains on the jacket to her testimony, and urged the jury to conclude that the blood was the victim's.  A conviction followed, which we affirmed in Commonwealth v. Marrero, 427 Mass. 65, 65 (1998).

Twenty years after the trial, however, the connection the prosecutor argued in closing was disproved:  postconviction deoxyribonucleic acid (DNA) testing definitively excluded the victim as a source of the blood on the defendant's jacket.  The defendant's motion for a new trial on that basis was denied, and a single justice in the county court granted leave to appeal.

Because the blood on the jacket was the strongest physical evidence tying the defendant to the murder, and because the Commonwealth used it to corroborate the testimony of a vital witness with credibility issues, we conclude that it was a real factor in the jury's deliberations. Consequently, had the new test results been admitted in evidence, and the Commonwealth been unable to connect the bloodstains to the murder, there is a substantial risk that the outcome of the trial would have been different. We therefore vacate the defendant's conviction and remand for a new trial.

Background. The victim was found bound and stabbed to death in his apartment in Greenfield on October 16, 1994. The defendant, who regularly sold drugs to the victim, was known to carry a knife and had a history of violence. The police investigation focused on him after interviews with several of the defendant's other drug customers placed the defendant at the victim's apartment at the time of the killing.

To assess the possible effect of the new analysis on the jury, we examine the evidence introduced at trial and consider how it factored into the arguments made by the prosecution and defense.

1. Commonwealth's case. The medical examiner opined that the victim died on or about October 14, 1994; the Commonwealth therefore relied on a series of witnesses to establish a

timeline of the defendant's whereabouts and place him at the victim's apartment on that date.

Jerry Desbiens -- who, like the victim, regularly acquired drugs from the defendant -- testified that, on October 13, the defendant had asked the victim if he could stay at the victim's apartment that night, and that the victim agreed and gave the defendant a key.  Later that day, Desbiens drove the defendant, who was wearing a black leather jacket, to the victim's apartment.

The victim's friend, David Prest, visited the victim's apartment that night from 10:30 P.M. to about 11:45 P.M. or 12 A.M.  Prest saw the defendant lying on a mattress, seemingly asleep.  When Prest departed, the defendant and the victim were alone.  That was the last time any witness saw the victim alive.

Lynn Morehouse, another customer of the defendant, testified that the defendant crawled through her apartment window at around 2 A.M. on October 14.  He was pacing, nervous, and afraid, and he repeatedly asked her to go next door to ask Desbiens to give him a ride.  She refused.  Morehouse also testified that the defendant wore a black leather jacket and, crucially, that he had dried blood on his hands and arms.

Another customer of the defendant, David Lucas, testified that the defendant came to his apartment sometime between 6 A.M. and 8 A.M.  The defendant told Lucas and Charles Johnson, who

was also present, that police were after him.  The defendant appeared extremely nervous and excited, and he was wearing the black leather jacket that "[he wore] all the time," according to Lucas.  Lucas also testified that he and Johnson took the defendant to Desbiens's house to see whether Desbiens would give the defendant a ride in exchange for cocaine.

Desbiens agreed and gave the defendant a one-half hour long ride to Chicopee at around 10:30 A.M.  According to Desbiens, during the ride the defendant confided that he had been hit in the head, and that the police were chasing him.  Desbiens again testified that the defendant wore a black leather jacket.

Finally, another witness, Isidro Herrera, testified that he gave the defendant a roundtrip ride between Holyoke and Chicopee at around noon, although he could not remember the specific day. According to Herrera, the defendant confided that he had killed someone with a knife, police were chasing him, and he needed money to fly to the Dominican Republic.[1]

These testimonial accounts were vital to the Commonwealth's case, as there was minimal physical evidence implicating the defendant.  We described the crime scene in the defendant's direct appeal:

---

[1] We note that, as damning as Herrera's testimony looks on the page, the prosecutor did not refer to him at all in closing argument.

> "The victim, Pernell R. Kimplin, was found dead in his
> apartment in Greenfield on October 16, 1994.  He was
> gagged, and his hands and feet were 'hog-tied' with
> electrical cords and rope.  He had been stabbed once in the
> chest and once in the back.  He also had been beaten about
> his head, neck, shoulders, and back with a wooden board
> broken from a dresser drawer.  The medical examiner opined
> that the victim died on or about October 14, 1994, as a
> result of the stab wounds."

Marrero, 427 Mass. at 66.  Blood samples recovered from the
victim's kitchen, living room, threshold, and door were tested
and compared to the blood of the defendant and the victim.[2]  The
Commonwealth's chemist testified that she attempted to perform
six different tests on the samples, but that three of those
tests could not yield conclusive results -- one because she
could not accurately obtain a baseline sample from the victim,
and two because the victim and defendant shared certain blood
subtypes, which meant that the tests would not discriminate
between the two men.

For most of the approximately twenty samples, the chemist
testified that the defendant was excluded as a source.  However,
she testified that she could not exclude the defendant as the
source from four of the samples, because those samples could
only be subjected to the inconclusive tests.

---

[2] Police also recovered a knife from the apartment, and the
Commonwealth's expert testified that human tissue on the blade
was from the victim.

Similar results were obtained from forensic examination of the defendant's black leather jacket, which was seized from him upon his arrest.[3]  Blood was detected on the inner sleeves and a back panel of the jacket, but due to the small quantity, testing at the time could not determine whose blood it was. Nevertheless, at closing, the Commonwealth invited the jury to infer that the blood was the victim's and explicitly argued that the results corroborated Morehouse's testimony:

> "[The forensic expert] talked about that test resulting in a positive for the presence of blood, and the presence of blood in the front of that jacket was in each and every quadrant, top and bottom; in the area -- well, on the top two quadrants of the sleeves, inside.  And isn't that consistent with a person who had bloody hands and then put that jacket on, and the contact would be to the interior areas of that jacket?  And that corroborates . . . Morehouse's testimony."

Finally, investigators matched fingerprints from the victim's apartment to two other individuals.[4]  A fingerprint matching the defendant was found on the underside of a folding chair, beneath a trash bag and laundry basket.  And a fingerprint matching Johnson was recovered from the overturned

---

[3] On February 12, 1995, the defendant flew from the Dominican Republic to the John F. Kennedy International (JFK) Airport in New York, where he was arrested pursuant to a Massachusetts warrant.  With him was his black leather jacket. During his interview with authorities at the airport, the defendant was evasive and at times untruthful; the Commonwealth argued this as consciousness of guilt.

[4] Police also collected fingerprints from Morehouse's apartment, none of which belonged to the defendant.

television that was the source of a cord used to tie up the victim.

2.  Defense theories.  In addition to attempting to induce reasonable doubt by attacking the credibility of the Commonwealth's witnesses -- a topic we discuss in further depth infra -- the defense advanced two main theories:  third-party culprit and alibi.  Johnson's fingerprint was a keystone of the former.  The defense argued that the victim was killed by either Johnson or Lucas (or both acting in concert), pointing not only to the fingerprint but also to evidence of motive:  Johnson and Lucas both sold drugs to the victim, and both had made several aggressive attempts to collect money from the victim, including assaulting him.  There was also testimony that Johnson had a key to the victim's apartment.

In addition to arguing that Johnson or Lucas killed the victim, the defendant also argued alibi:  he claimed that he was out of the country at the alleged time of death.  The foundation of this defense was a flight record produced midtrial, which an airline employee testified showed that (1) a reservation was made on October 13 through a travel agency with a telephone number with a western Massachusetts area code, and (2) on October 14 an "E. Marrero" checked in at John F. Kennedy International Airport in New York at 5:19 A.M. and boarded a 7 A.M. flight to the Dominican Republic.

These times directly contradicted the testimony of Lucas and Desbiens, which was that they had interacted with the defendant as late as 8 A.M. and 10:30 A.M. on October 14, respectively. The defense argued that the flight record also cast doubt on whether the defendant could have been in Morehouse's apartment at 2 A.M.

In rebuttal, the Commonwealth argued that another "E. Marrero" had taken the flight[5] or, alternatively, that the defendant made the reservation and had someone else take the flight.[6]

3. Verdict and posttrial events. The jury convicted the defendant of murder in the first degree on the theories of premeditation and extreme atrocity or cruelty. We affirmed the conviction in Marrero, 427 Mass. at 65. In 2002, the defendant filed his first motion for a new trial, which was denied, and in

---

[5] In support of this point the Commonwealth called in rebuttal a record keeper from the telephone company serving New York City, who testified that the directories for the Bronx and Queens contained a combined twenty-six listings for individuals named "E. Marrero."

[6] In support of this point, the Commonwealth called in rebuttal the owner of a travel agency in Springfield that the defendant was known to use. His equivocal testimony was only that he had no internal record of the reservation in question, but that he would not expect to, given his record-keeping practices.

2011, his motion for DNA testing pursuant to Mass. R. Crim. P. 30 (c), as appearing in 435 Mass. 1501 (2001), was also denied.

In 2017 a second motion for DNA testing, this one made under G. L. c. 287A, was granted. The resulting DNA tests excluded the victim as a source of DNA from the blood found on the defendant's jacket,[7] prompting the defendant to file the 2020 motion for a new trial that is the subject of this appeal. A Superior Court judge denied the motion, and a single justice in the county court allowed the defendant's G. L. c. 278, § 33E, "gatekeeper" petition for leave to appeal.

Discussion.[8] Where, as here, a motion for a new trial is premised on "newly available analysis that would remove from the jury's consideration evidence admitted at trial in the Commonwealth's case, . . . we ask whether the inculpatory evidence likely was a 'real factor' in the jury's deliberations such that its elimination would cast real doubt on the justice of the defendant's conviction" (quotation omitted).

---

[7] The testing also excluded the defendant as a source of blood samples recovered from the victim's apartment, and showed partial DNA profile matches with the victim.

[8] In his motion for a new trial and again on appeal, the defendant advances multiple arguments, including that the prosecution failed to disclose potentially exculpatory evidence related to the flight record. As we determine that the results of the postconviction testing on the defendant's jacket are sufficient to require a new trial, we confine our discussion to that issue.

Commonwealth v. Cowels, 470 Mass. 607, 618 (2015).  See Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001).  Because the motion judge was not the trial judge and took no evidence on this issue, our review is de novo.  See Commonwealth v. Mazza, 484 Mass. 539, 547 (2020).

We have ordered a new trial in two cases involving murder in the first degree under circumstances closely paralleling those in the instant case.  In Commonwealth v. Sullivan, 469 Mass. 340 (2014), the Commonwealth's key percipient witness identified a purple jacket as the same one the defendant was wearing during the killing, and the Commonwealth offered expert testimony that the jacket tested positive for blood on both cuffs.  Id. at 345.  The key witness's credibility was challenged by extensive testimony from defense witnesses, which suggested a third-party culprit.  Id. at 346-348.  In closing, the prosecutor argued that the jury should credit her account that the defendant was the killer, because the blood on the jacket corroborated her testimony.  Id. at 349.  Postconviction testing revealed that the victim's blood was not present.  Id. at 340-341.

In Cowels, 470 Mass. at 607-608, the Commonwealth introduced two bloodied towels at trial.  The forensic testing available at that time was inconclusive:  neither the defendants nor the victim could be identified or excluded as the source of

the blood.  Id. at 608.  The Commonwealth's star witness testified that the defendants used his bathroom to clean themselves after killing the victim, and, after "his credibility was extensively impeached during cross-examination," the Commonwealth argued in closing that the towels, which were recovered from the witness's bathroom, corroborated his testimony.  Id. at 609-610.  Postconviction testing on one of the towels, however, was able to definitively exclude both defendants and the victim as possible sources of the blood.  Id. at 608.

In both Sullivan and Cowels, we identified the same two factors that were central to our evaluation of the evidence affected by the new test results, and thus central to our decision to grant a new trial.  The first was that the physical evidence at issue was critical to the Commonwealth's case because of a paucity of other physical evidence connecting the defendants to the killings.  See Cowels, 470 Mass. at 619 ("The only physical evidence that the Commonwealth offered linking the defendants to the crime was the towels, Cowels's sneaker, and the vaginal swab"); Sullivan, 469 Mass. at 352 (pieces of evidence negated by testing were important "because they served as the sole pieces of physical evidence indicating the defendant had been in the presence of the victim during the killing").  The second, related factor was that in each case the

Commonwealth had used the physical evidence in question to corroborate the testimony of a key, but embattled, witness.  See Cowels, supra at 620 ("Here, the towels were the only physical evidence corroborating a key element of an important prosecution witness's testimony, and functioned to reinforce [witness's] severely challenged credibility"); Sullivan, supra at 353 ("the evidence was probably a real factor in the jury's deliberations because it was one of the pieces of physical evidence that the prosecution pointed to more than once in closing as a basis on which to credit [Commonwealth witness's] testimony over that of [defense witness]").

Both factors are present in the instant case.  The bloodstains on the jacket were the most vital piece of physical evidence offered by the Commonwealth.  Although there was extensive testimony as to the state of the crime scene and results of various forensic tests, no other physical evidence directly implicated the defendant.[9]  See Sullivan, 469 Mass. at

---

[9] We acknowledge that investigators found the defendant's fingerprint on the bottom of a chair located in the victim's apartment.  However, there was no dispute that the defendant had been in the apartment, and the print was recovered from the underside of a chair that was itself located under other household objects.  Moreover, the other single fingerprint recovered from the apartment, Johnson's, was found on an overturned television -- the same television from which a cord had been torn and used to bind the victim -- supporting the defendant's third-party culprit theory.  Thus, although the presence of the fingerprint precludes us from saying that the bloodstains on the jacket were the only physical evidence

353 ("Without the purple jacket, the defendant could have argued at closing that not one piece of physical evidence linked the defendant directly to the killing of the victim"). Of all the physical evidence, only the bloodied jacket allowed the Commonwealth to argue that the defendant was in the victim's apartment, at the time of the killing, with the victim's blood on his hands. See id. Contrast Commonwealth v. Duguay, 492 Mass. 520, 534 (2023) (new test results did not merit new trial where "there were numerous other pieces of physical evidence . . . that would still link the defendant to the murder").

In addition to arguing for the jury to infer that the blood on the jacket was the victim's, the Commonwealth also used the bloodstained jacket to buttress the testimony of Morehouse. Morehouse was an important witness. Her testimony was the first account of the defendant after the killing, and the vivid content of that testimony -- him desperately stealing into her apartment with bloody hands -- was the most inculpatory eyewitness testimony at trial.[10]

---

connecting the defendant to the crime, we have no problem concluding that the bloodstains were key to the Commonwealth's case in a way the fingerprint was not. See Sullivan, 469 Mass. at 352-353 (highlighting importance of defendant's bloody jacket where "physical evidence also tied [the prosecution's key witness] to the killings, including his bloody fingerprint on the inside passenger side of the defendant's car").

[10] Her testimony of seeing the defendant in her apartment at 2 A.M. on October 14 was also the only account from that day

And as with the key witnesses in Sullivan and Cowels, Morehouse suffered from credibility issues. The jury learned that, at her first interview with police, she denied seeing the defendant with the victim on October 13 at all, and denied seeing the defendant the next morning. She also admitted to drug use, and to calling the police on the defendant multiple times. See Cowels, 470 Mass. at 619 (key prosecution witness was, "[i]n the prosecutor's own words, . . . 'a junkie' with a 'checkered background' and a 'long criminal record,'" had given contradicting accounts to police, and had motive to implicate defendant). Where the prosecutor argued to the jury that the blood on the jacket corroborated her testimony, the newly available analysis is not merely impeachment evidence, but rather "negates a key piece of physical evidence that the prosecution relied on in arguing that the jury should credit [Morehouse's] testimony." Sullivan, 469 Mass. at 352.

"We acknowledge, as did the motion judge, that much of the evidence the Commonwealth presented against the defendant remains, and that the Commonwealth may have been able to carry its burden to prove beyond a reasonable doubt that the defendant committed murder in the first degree even without the evidence

---

that could theoretically be reconciled with the flight record, which, if credited by the jury, placed the defendant at the check-in counter at JFK Airport at 5:19 A.M.

of the [leather] jacket." Sullivan, 469 Mass. at 353.  We further acknowledge that, viewing the evidence as a whole, this case presents a closer question than Sullivan or Cowels.  But ultimately, "our inquiry is not whether the verdict may have been different, but whether the evidence in question probably served as a real factor in the jury's deliberations." Sullivan, supra.  Where the bloodstained jacket was the most important piece of physical evidence offered to connect the defendant to the crime, and where the prosecutor further used the jacket to corroborate the most important testimonial evidence -- evidence given by a witness with credibility issues -- we conclude that the bloodstains likely were a real factor in the jury's deliberations.  We do not opine on the defendant's guilt or innocence, but we are bound to ensure that such guilt or innocence is determined justly.  Accordingly, a new trial is required.  See Cowels, 470 Mass. at 623.

Conclusion.  The judgment of conviction is vacated and set aside, and the matter is remanded to the Superior Court for a new trial.

So ordered.