COMMONWEALTH *vs.* MICHAEL COWELS
(and a companion case[1]).

Suffolk. April 9, 1997. - June 20, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & FRIED, JJ.

*Joint Enterprise. Homicide. Evidence,* Joint enterprise. *Practice, Criminal,*
Comment by prosecutor, Instructions to jury, Reasonable doubt, Severance,
Capital case. *Malice. Intoxication.*

Evidence at the trial of two defendants for murder in the first degree by
reason of extreme atrocity or cruelty was sufficient to allow the jury to
convict each defendant as either a principal or as a participant in a joint
venture. [285-286]
At the trial of first degree murder indictments, the prosecutor's improper
remarks in closing argument, attempting to elicit sympathy for the victim
and asserting facts not in evidence, did not, in light of the judge's instruc-
tions and the jury's focus on the main issues in the case, require a new
trial. [286-288]
At the trial of murder indictments, there was no reversible error in the judge's
instructions to the jury on the issue of reasonable doubt [288-289], and
there was no substantial likelihood of a miscarriage of justice created by
the judge's instructions on malice [289].
At the trial of indictments for murder in the first degree, the judge's instruc-
tion on intoxication did not create a substantial likelihood of a miscarriage
of justice in view of the lack of evidence of the defendants' having been
affected by debilitating intoxication and the strong evidence of the severe
and numerous wounds of the victim. [289-291]
In a murder case, there was no abuse of discretion or other error in the judge's
refusal to give an instruction on the failure of the investigating authorities
to conduct certain forensic tests; in the judge's supplementary instructions
to the jury; in the judge's denial of one defendant's motions to suppress
his statements and to sever his trial; in the judge's denial of a mistrial
upon a minor Commonwealth witness's claim of his privilege against self-
incrimination; or with respect to any other evidentiary rulings. [291-293]
No reason appeared for this court to exercise its powers under G. L. c. 278,
§ 33E, to grant either defendant convicted of murder in the first degree a
new trial or to reduce the verdicts to a lesser degree of guilt. [293]

INDICTMENTS found and returned in the Superior Court Depart-
ment on August 6, 1993.

---

[1]Commonwealth *vs.* Michael Mims.

The cases were tried before *Thomas E. Connolly*, J.

*Dana Alan Curhan* for Michael Mims.

*Donald A. Harwood* for Michael Cowels.

*Joseph Makalusky*, Assistant District Attorney (*James W. Coffey*, Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J. The defendants, Michael Cowels and Michael Mims, were tried together before a jury in the Superior Court and found guilty of murder in the first degree by reason of extreme atrocity or cruelty. Represented by new counsel on appeal, both defendants argue that the judge should have allowed their respective motions for a required finding of not guilty. We conclude that the Commonwealth's evidence was sufficient to warrant the defendants' convictions of murder in the first degree. We reject the defendants' other arguments that are directed at obtaining a new trial. We also find no basis to grant either defendant any relief under G. L. c. 278, § 33E. Accordingly, we affirm the defendants' convictions.

The evidence, considered in the light most favorable to the Commonwealth, would have permitted the jury to find the following facts. On Saturday, June 26, 1993, the victim, Belinda Miscioscia, was socializing at her brother's home in Chelsea with her brother, her brother's girl friend, and a friend with whom she had made plans for the evening. After drinking a few beers, the four decided to "pitch in" on a bag of marihuana, and the victim "paged" Cowels, from whom she previously had made similar purchases. After an initial effort to connect with Cowels at a neighborhood store failed, the victim again paged him and made arrangements to meet him at a party down the street from her brother's house. Although she said she was afraid to meet with Cowels by herself, the victim left her brother's home between 8:45 and 8:55 P.M. and walked, alone, down the street to the party. When she failed to return home after about one and one-half hours, the others became anxious and attempted to contact Cowels by paging him several times. Eventually, the victim's friend left, assuming that he had been stood up, and the others went to bed.

At the party, the victim met Cowels and Mims, with whom she was also familiar. Both defendants had had previous sexual encounters with the victim. The three left the party and went together to an apartment where a friend of the

defendants, Robert Salie, lived. The four shared a marihuana cigarette. Both defendants and the victim went into Salie's bedroom and engaged in sexual intercourse, offering Salie a chance to join in, which he declined. The victim and the defendants subsequently left Salie's apartment and drove away in Cowels's automobile.

At around 11 P.M., the group arrived at Cowels's sister's condominium unit. When Cowels's sister returned home from work around 11:20 P.M., she was angered to find the victim there with her brother and insisted that they all leave. The three left in Cowels's automobile.

At about 11:30 P.M., Salie's doorbell rang, and he opened his door. The defendants rushed inside and went directly to the bathroom, where they remained for approximately twenty minutes. When they emerged from the bathroom, the defendants were carrying their clothes in plastic bags. Mims sat on the couch. Cowels showed Salie one of his sneakers, spotted with blood, and told Salie, "This is what happens when you fuck with me," and Cowels proceeded to warn Salie that if he "said anything [he would] get hurt." Cowels then told Salie that "you will read about it in the papers tomorrow." Cowels explained his statement by telling Salie that newspaper articles would disclose "how we killed her." After this last statement, Cowels winked at Mims. Both Cowels and Mims then told Salie that the victim "was a fucking pig and got what she deserved."

Cowels again threatened Salie by pointing a finger at Salie's head, simulating a gun, and told Salie that if he said anything, he would get "fucking hurt." Mims also told Salie to keep his mouth shut. Salie gave the defendants clean clothes, including a pair of green and grey hiking boots, which he gave to Mims.

The defendants left Salie's apartment but returned a third time about 1 A.M.[2] The defendants repeated their threats to Salie and warned him again to "keep his mouth shut." Cowels predicted that "he was going to jail." Mims asked if he could spend the night, and Salie agreed. Cowels then left the apartment, and Mims spent the night on Salie's couch.

The next morning, Salie and the defendants went to play softball. At the softball game, Mims wore the shoes loaned to

---

[2]When they returned to Salie's apartment the third time, the defendants were not carrying any bags.

him by Salie. A friend of Mims noticed that he was not wearing his expensive Reebok sneakers, and when questioned, Mims explained that he had thrown them out because they had gotten "all wet and squeaky" in the rain the previous night. (Testimony indicated that it had not rained on Saturday night.)

Meanwhile, the victim's family was dismayed to discover that she had not returned home Saturday night. The victim's niece was scheduled to be christened Sunday morning, and her family thought it odd that the victim would miss the event. They proceeded to page Cowels, who did not respond, and drove around the neighborhood looking for the victim. When Cowels finally returned their page, he denied any knowledge of the victim's whereabouts and said he had dropped the victim off at a neighborhood store at 11:30 P.M. on Saturday night. Cowels was hostile and said he did not care where the victim was. That night, the victim's family filed a missing person's report at the Chelsea police station.

The next morning, the victim's body was found lying face down in a pool of blood, on top of a small platform, only a few miles from Salie's apartment, in a location described as a "lover's lane type area." She had suffered six different stab wounds, three to her body and three to her neck, as well as slash wounds to her neck and wounds to her right hand that were characterized as "defensive." Her face was so badly beaten that her family had difficulty identifying her. A bag of marihuana was found stuffed inside her bra. An autopsy determined that the victim had been killed late on Saturday night or early on Sunday morning, and that she had died from multiple stab wounds produced by one or possibly two knives. One of the stab wounds had penetrated the victim's heart.

Trooper Randy Cipoletta of the State police obtained Cowels's pager number from the victim's family and arranged a meeting. When Cowels came to meet with the police, he was wearing what appeared to be a brand new pair of sneakers. Cowels was told only that the police were investigating a missing person report. Cowels stated that he had been with the victim on Saturday night but that he, Mims, and two others had been playing pool at a bar named Triple O's and had

later dropped the victim off near her home.[3] Cowels acknowledged that his pager had gone off several times during the evening, but explained that he had told the victim her family was trying to reach her and that the victim had failed to return their calls. Cowels referred to the victim as a "pig" during his interview with police. After Trooper Cipoletta stated that he wanted to speak with Mims, Cowels offered to go pick up Mims and bring him back to the police station. Mims's statement to the police mirrored that of Cowels, including references to the victim as a "dirty pig." While Mims was being interviewed, Cowels waited outside the interview room, where he was approached by State police Sergeant Michael J. Crisp, who asked to speak with him. Cowels repeated his original story to Sergeant Crisp, but was startled when Crisp relayed the fact that police had already discovered the victim's body. Cowels suddenly burst into tears and cried, "I'm only twenty-three years old. I don't want to go to jail." Cowels quickly composed himself and asked whether he was free to go, to which Sergeant Crisp assented. Cowels and Mims were allowed to leave the police station.

Other evidence surfaced during the police investigation. A friend of Cowels observed a pair of sneakers in the trunk of Cowels's car and asked him if they were the "notorious sneakers that everyone was talking about." Cowels acknowledged that they were the sneakers and then, while his friend was watching, threw them into some nearby bushes. Cowels's friend later led police to the sneakers, which tested positive for the presence of blood on the sole of the left shoe, even though they were not found until nearly one month after the crime. A search of the bathroom in Salie's apartment turned up two towels that tested positive for the presence of human

---

[3]Cowels claimed that Lawrence Bavis, a bartender at Triple O's, had been playing pool with them. After police requested a meeting with Bavis, Bavis was approached by Cowels and a friend of Cowels. Cowels and his friend told Bavis to "remember" that the four had played pool the night before. In his subsequent interview with police, Bavis denied that he had been playing pool at Triple O's with Cowels or Mims on the night of the murder.

After they left the victim near her home in Chelsea, the defendants said that they went to a bar and that later Cowels dropped Mims off at Salie's apartment before going to his girl friend's home to spend the night.

blood.[4] Occult blood was also found on the inside door release on the driver's side of Cowels's car, as well as on the gear shift knob, which had fallen off the stick shift and was found on the floor of Cowels's car, between the passenger's seat and the door.

Some evidence that could have assisted the murder investigation disappeared. A shirt belonging to Cowels, which purportedly had a "rust colored" stain on its front, could not be found. Salie's grey and green boots, which had been seen by police in Mims's closet after the murder, also disappeared.[5] In addition, some evidence was found that did not connect the two men to the murder. Salie gave police a black T-shirt, which he said Mims had worn on the night of the murder. The T-shirt tested negative for the presence of blood, as did the couch on which Mims spent the night. Napkins found at the scene of the murder tested positive for a blood type which was not that of either the defendants or the victim.

There was also evidence that the defendants went to considerable lengths to block the police investigation into the murder. There was the evidence, previously recounted, that both defendants disposed of clothing and other items that were important to the investigation and threatened Salie to keep him from revealing their activities on the night of the murder, and the additional evidence showing that both defendants had lied in the statements they gave to the police. Mims was present when a friend of his was subpoenaed, and after reading the subpoena, Mims exclaimed, "Fuck them. You don't have to say nothing to them fucks." Salie indicated that he received a threatening note on his door (from an unidentified sender) that warned him, "You talk, you die."

For their part, the defendants contended that they did not commit the crime. They attacked the Commonwealth's case by attempting to show that Salie should not be believed; by suggesting that other men may have committed the murder; by criticizing the thoroughness of the police investigation; by introducing statements to the police that placed them

---

[4]Tests on the towels were inconclusive, although the chemist at the State police laboratory testified that there was a "weak reaction" to blood type A. Both the defendants and the victim had type O blood.

[5]Police had noticed these boots during a search of Mims's sister's apartment. When questioned about the boots, Mims claimed that they were his and that he wore them when he played softball.

elsewhere at the time of the murder; and by introducing testimony that tended to support their alibi statements.

1. Both defendants moved for required findings of not guilty at the close of the Commonwealth's case and at the close of all the evidence. The motions were denied. The jury were given instructions that permitted them to find each defendant guilty of the victim's murder either as a principal or as a participant in a joint venture. We conclude that the Commonwealth's evidence was sufficient to allow the jury to convict each defendant on both theories.

"[T]he fact that the defendant[s were] the last person[s] seen with the victim, at a time and place in close proximity to where the victim was shortly thereafter found in a battered condition, is probative evidence of the defendant[s'] guilt." *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 55 (1975). See *Commonwealth* v. *Stewart*, 411 Mass. 345, 350-351 (1991). Further, the evidence supported a conclusion by the jury that both defendants were present with the victim when she was murdered. The victim's body was found in a location described as a "lover's lane type area" with a bag of marihuana stuffed inside her bra. In view of what had transpired between the victim and the defendants on the night of the murder, and their base opinion of her as promiscuous, the jury could find that she had been murdered after a disagreement with the defendants over sex, drugs, or both. Cowels made several damaging statements that directly implicated him in the murder. These included a statement when he showed Salie a blood-stained sneaker that, "This is what happens when you fuck with me," an admission that "we killed her," a statement that "he was going to jail," and a statement that "I'm only twenty-three years old. I don't want to go to jail." Mims stated that the victim "was a fucking pig and got what she deserved." The jury could find that Mims was present in Salie's apartment and did not object after hearing Cowels tell Salie that the newspapers the following day would have an article describing "how *we* killed her" (emphasis added). The medical testimony indicated that the victim was stabbed by one or possibly two knives. The jury also could have found that both defendants had engaged in a considerable common effort to conceal the crime, including disposing of their clothing and other items that could link them to the murder, threatening and intimidating witnesses, giving the

police false statements, and arranging testimony to support those false statements.

Cowels states in his brief on appeal that a required finding of not guilty should have been entered because "[a]s argued by [his] defense counsel [at trial], the scientific evidence did not sufficiently establish the defendant's guilt." There is no merit to this argument. The summary of the case against Cowels set forth above was sufficient to warrant his conviction of murder by the jury.

Mims's trial counsel made no objection to the admission of Cowels's statement to Salie that "we killed her," and no argument is made on appeal that the statement was not properly received in evidence against Mims as an admission. The present argument by Mims's appellate counsel is essentially that the statement has no probative value because, based on Cowels's wink at the time it was made, the statement was ambiguous. Mims's appellate counsel also argues that Mims's statement to Salie that the victim "got what she deserved" could not reasonably have been construed by the jury as any indication of his participation in the murder. We think these arguments go to the weight of the evidence, a matter exclusively reserved for the jury, *Commonwealth* v. *Montecalvo, supra* at 56, and that the jury could have properly considered the statements as inculpating Mims in the murder. We conclude that Mims's argument takes too narrow a view of the Commonwealth's case and that the prosecution's evidence, taken as a whole with reasonable inferences that could be drawn from it, including the incriminating conduct of the defendants after the murder, was sufficient to warrant a finding by the jury, under the "any rational trier of fact" standard, that Mims was guilty.[6] *Commonwealth* v. *Cordle,* 412 Mass. 172, 175 (1992). See *Commonwealth* v. *Cruz,* 416 Mass. 27, 29 (1993); *Commonwealth* v. *Doucette,* 408 Mass. 454, 461 (1990).

2. Both defendants argue that they are entitled to a new

---

[6]We reject Mims's argument that we should abandon the "any rational trier of fact standard" first described in *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), *S.C.,* 423 Mass. 129 (1996), in favor of a standard that assesses the evidence in terms of what a "reasonable jury" could find. The *Latimore* standard fully protects a defendant's due process rights under the Federal and State Constitutions. See *id.,* citing *Jackson* v. *Virginia,* 443 U.S. 307, 318-319 (1979).

trial because the prosecutor's closing argument was improper and prejudicial. In his summation, the prosecutor repeatedly referred to the defendants' characterization of the victim as a "fucking dirty pig." He also referred, in the language set forth below, to the possibility that the victim had suffered at her death.[7] The defendants objected to these portions of the prosecutor's closing argument and argue on appeal that these comments impermissibly played on the prejudices of the jury.

The prosecutor could properly make some reference in his closing argument to the defendants' statements that the victim was a "fucking dirty pig" because there was evidence that both defendants had made the statement, and the characterization went to the issues of motive and joint venture. The prosecutor's argument was, in part, fair rebuttal to the contentions made by the defendants' trial counsel in their summations that there was no evidence of motive or joint venture. See *Commonwealth* v. *Mello*, 420 Mass. 375, 380-381 (1995). We agree with the defendants that the prosecutor's mention of the defendants' statements at least nine times in his summation went over the line of acceptable commentary and constituted an effort by the prosecutor to stimulate sympathy for the victim. We do not, however, consider the excess a basis for reversal.

The prosecutor's "bottle up her screams" argument was based on facts not in evidence and was improper. The judge's instructions emphasized the jury's obligation in the following terms: "You are to perform your duty without bias, prejudice or sympathy as to any party. Both the defendant and the public expect that you will carefully and impartially consider all the evidence in the case, apply the law as stated by me, and above all to reach a just verdict regardless of the consequences." The judge also pointed out that the arguments of counsel did not constitute evidence. Because of the judge's instructions and the jury's focus on the main issues in the

---

[7]"How do you capture what happened to that woman on that platform trying to defend herself as she's getting brutally, savagely murdered. You can't possibly. I wish I could bottle up her screams, put them in a bottle and a year and a half later open the bottle so you could hear her screams to get a flair of what that woman went through."

case,[8] the prosecutor's regrettable remarks do not require a new trial.[9] See *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 232 (1992).

3. The defendants raise several issues with respect to the adequacy of the judge's instructions to the jury. We next address these issues.

(a) During his discussion of the concept of reasonable doubt, the judge made a misstatement by omitting the word "not" from a portion of the instruction.[10] Trial counsel for the defendants called the omission to the judge's attention. The judge did not make a specific correction, but instead reinstructed the jury that the Commonwealth had the burden of proof beyond a reasonable doubt on each and every element of the crimes charged. No further objection was made to the reinstruction.

The judge's omission does not provide a basis for a new trial. The instructions on reasonable doubt, considered as a whole, correctly explained reasonable doubt, see *Commonwealth* v. *Rosa*, 422 Mass. 18, 27 (1996), and, as a consequence, it is likely that a reasonable juror would have understood that the incorrect sentence contained a slip of the tongue, see *Commonwealth* v. *Grant*, 418 Mass. 76, 85 (1994). Importantly, in response to a question by the jury during deliberations for "review . . . [of] the legal definition of reasonable doubt," the judge correctly reinstructed on the concept. After the reinstruction, a reasonable juror could not

---

[8]After a period of deliberations, the jury asked for reinstruction on the legal definition of "reasonable doubt" and an explanation "how the defendants [*sic*] behavior after the fact may be a factor in determining the verdict." The judge reinstructed the jury on reasonable doubt, the principles of joint venture, and the standards for evaluating consciousness of guilt evidence. The judge also told the jury once again that they were to "render a fair, just verdict and speak the truth."

[9]The prosecutor also told the jury, with reference to the evidence that the defendants had given false statements to the police, that "Innocent men don't lie. Period. Guilty men lie." There was no objection to the remark. We do not consider the comment as expressing the prosecutor's personal belief. Even if the remark could be considered improper, it did not create a substantial risk of a miscarriage of justice.

[10]The judge said to the jury: "Similarly, if your minds are left wavering, unsettled and unsatisfied because of a conscious uncertainty as to the defendant's guilt, you also must return a verdict of guilty."

have misunderstood the concept because of the mistake in the original charge.[11]

(b) In his definition of malice, the judge linked the concept to a "frame of mind which includes not only anger, hatred and revenge, but also every other unlawful [or] unjustifiable motive." No objection was made, and the jury instructions on malice were otherwise correct in explaining the three prongs of malice described in *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987). The case was tried before our decision in *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995), which disapproved of the "anger, hatred and revenge" language. We conclude that the reference did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Torres*, 420 Mass. 479, 486-487 (1995).

(c) The defendants requested an instruction that the jury should consider the effect of intoxication in deciding whether they specifically intended to kill the victim and acted with malice or premeditation.[12] The defendants also requested a somewhat confusing instruction on the issue of mental impairment.[13] A charge conference was held by the judge, but no record was kept of the results of the conference. The judge

---

[11]The judge instructed the jury that the Commonwealth was not required to prove the defendant's guilt "to an absolute certainty, nor . . . beyond all possible doubt" because "there are very few things that can be proven to an absolute certainty." We reject the defendants' argument that this instruction constituted error.

[12]The instruction was requested by trial counsel for Cowels, but we consider the request to have been made by both defendants.

[13]This requested instruction read as follows:

> "In the Commonwealth of Massachusetts, the killing of another with an intent to kill, but *without* malice is voluntary manslaughter. You cannot find malice unless you find beyond a reasonable doubt that the defendant had an intent to kill, to do grievous bodily harm, or to do an act creating a plain and strong likelihood that death or grievous harm would follow. You may consider the evidence of the defendant's mental impairment at the time of the act alleged to have resulted in the death of the deceased in determining whether the defendant had the capacity to form a specific intent to kill the deceased or to do him grievous bodily harm. If, after considering all the evidence, including the evidence of the defendant's mental impairment, you have a reasonable doubt as to whether the defendant specifically intended to kill the deceased or to do him grievous bodily harm, you may consider whether malice has nonetheless been established on the basis of an intentional act by the defendant act [*sic*] alone, however, unless you also find beyond a reasonable doubt that, when the defen-

instructed the jury that they could consider voluntary intoxication "in determining whether or not the Commonwealth has proven beyond a reasonable doubt that the defendant or the defendants committed or attempted to commit the crime with an intent which exhibited a conscious disregard to human life." The judge also told the jury that voluntary intoxication had relevance to malice and was "one of the factors you should consider in your deliberations on the issue of whether the defendant[s] had specific intent to kill or grievously injure the victim." The defendants' trial counsel made no objection to the instruction and no additional instructions were requested. The defendants now argue that a new trial is required because the judge's intoxication instruction should have been extended to the so-called "third prong" of malice[14] which has relevance to murder in the first degree by reason of extreme atrocity or cruelty and murder in the second degree.

We conclude that the defendants' argument is to be decided under the substantial likelihood of a miscarriage of justice standard. The instruction given by the judge appears to constitute an effort by him to respond to the defendants' requested instruction on intoxication. The judge may have considered the requested instruction on mental impairment, see note 13, *supra*, as unnecessary because there was no evidence that the defendants suffered from any mental impairment (apart from the issue of intoxication), and because the instruction appears by its own terms to have been directed at a finding of voluntary manslaughter, a verdict that had no basis in the evidence, even though the judge instructed on it and gave it to the jury as an option. What the judge said about voluntary intoxication did not disturb the defendants'

---

dant committed the act, he had actual knowledge of the circumstances from which a reasonably prudent person would have known that its likely consequence would be death or great bodily harm. In determining whether the defendant had such actual knowledge, you may consider all the evidence bearing on his state of mind at the time of the act in question, including the evidence of his mental impairment. *Commonwealth* v. *Grey*, 399 Mass. 469 (1987)."

[14]This aspect of malice allows a jury to find malice by inference, after they decide what the defendant subjectively knew, and conclude, based on that knowledge, that the defendant committed an act which a reasonably prudent person would know was likely to result in the death of another.

trial counsel, who, as has been mentioned, made no objection and asked for no additional instructions. The principal issue at trial was the identity of the murderer or murderers. No contention was made that the victim had not been murdered; the defendants asserted instead that Salie should not be believed and that they were somewhere else when the victim was murdered. See *Commonwealth* v. *Moore*, 408 Mass. 117, 134 (1990), and cases cited. Although there was some evidence that the defendants had been drinking and had shared a marihuana cigarette,[15] there was no evidence that they were so intoxicated that they lacked awareness of their actions. See *Commonwealth* v. *Fano*, 400 Mass. 296, 306-308 (1987), and cases cited. Further, in view of the testimony of the medical examiner that the victim had been stabbed six times, had suffered slash wounds to her neck and "defensive" wounds to her right hand, and had been severely beaten, the case was not a "third prong" malice case. See *Commonwealth* v. *Pierce*, 419 Mass. 28, 37, 39 (1994); *Commonwealth* v. *Moore*, *supra* at 135; *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 5-6 (1986). The judge's instruction on intoxication did not create a substantial likelihood of a miscarriage of justice.

(d) The defendants' trial counsel were allowed full latitude to present and argue to the jury their contention that the failure of the investigating authorities to conduct certain tests undermined the prosecution's case. The decision whether to instruct the jury on the failure to conduct forensic tests lies within the discretion of the trial judge, *Commonwealth* v. *Cordle*, 412 Mass. 172, 177 (1992), and the judge's refusal to give an instruction did not constitute an abuse of discretion. *Commonwealth* v. *Rivera*, 424 Mass. 266, 274 (1997).

(e) The judge had discretion in deciding how to respond to the jury's requests for reinstruction on reasonable doubt and on "how the defendants' behavior after the fact may be a fac- tor in determining the verdict." The judge did not abuse that

[15]Salie testified that he, the defendants, and the victim shared a marihuana cigarette around 9:30 P.M. Cowels's sister testified that she "thought [the defendants] were drunk" when they left her apartment. The defendants, in their statements to the police attempting to establish an alibi, stated that they had gone to various places and had a "few drinks" at each place. There was no evidence of the quantity of alcohol consumed and no evidence of how the defendants behaved which might indicate that they were affected by debilitating intoxication.

discretion by including in his response to the jury further instruction on the principles of joint venture.

4. The defendants' remaining contentions need not be discussed at great length.

(a) Cowels sought to exclude his statements to Salie on the ground that they were the product of intoxication. The judge held a voir dire and ruled that the statements were voluntary and rationally made. Salie's testimony warranted the judge's implicit factual finding that, although Cowels may have consumed some alcohol and shared a marihuana cigarette, his mind was rational, and his faculties under control, when he made the statements. See *Commonwealth* v. *Koney*, 421 Mass. 295, 305 (1995).

(b) There is no merit to Cowels's claim that the judge erred by denying his motion to sever his trial from Mims's trial so that Mims could testify and corroborate Cowels's alibi. This ground did not furnish a basis for requiring severance, and no abuse of discretion occurred when the judge denied the motion.[16]

(c) A Commonwealth witness, Angel Gonzalez, unexpectedly claimed his privilege against self-incrimination before the jury. The judge did not err in denying a mistrial. The prosecution engaged in no misconduct and was taken by surprise by the witness's claim. Based on the "specific requests of all three counsel in the case," the judge did not instruct the jury on the matter. Gonzalez was a minor Commonwealth witness, and his demurral added no critical weight to the Commonwealth's case. See *Commonwealth* v. *Martin*, 372 Mass. 412, 422 (1977).

(d) The four evidentiary rulings, argued only cursorily by the defendants, raise no basis for a new trial. The judge's solitary comment that a police report should be marked "for the record on appeal" could have created no harm in view of the judge's final instructions to the jury. The defense witness, John Heald, was properly impeached by his conviction for a drug offense on which the sentence was suspended. See G. L. c. 233, § 21, second par. Salie's testimony about a threatening note left at his door, and testimony by the witness Cheryl Tatarouns that the victim was afraid to meet "Mike" by

---

[16]Mims's statement, which corroborated Cowels's statement of alibi, was introduced in evidence through police testimony.

herself, although they may have been erroneously admitted, caused no prejudice.

5. We have reviewed the entire record and found no reason to exercise our extraordinary powers under G. L. c. 278, § 33E, to grant either defendant a new trial or to reduce the verdicts returned by the jury to impose a lesser degree of guilt. The conviction of each defendant of murder in the first degree is affirmed.

*So ordered.*