NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10658

COMMONWEALTH  vs.  FRANK DiBENEDETTO.


Suffolk.     May 5, 2016. - September 8, 2016.

Present:  Gants, C.J., Spina, Botsford, Duffly, & Hines, JJ.[1]


Deoxyribonucleic Acid.  Practice, Criminal, New trial, Appeal.
    Supreme Judicial Court, Jurisdiction.  Evidence,
    Exculpatory.



    Indictments found and returned in the Superior Court
Department on May 21, 1986.

    Following review by this court, 458 Mass. 657 (2011), a
motion for a new trial was heard by Robert A. Mulligan, J.

    A request for leave to appeal was allowed by Cordy, J., in
the Supreme Judicial Court for the county of Suffolk.


    Wendy H. Sibbison (Dennis A. Shedd with her) for the
defendant.
    Zachary Hillman, Assistant District Attorney, for the
Commonwealth.
    David B. Hird, Cecile Farmer, & Vanshika Vij, of the
District of Columbia, Patrick O'Toole, Jr., & Evan Miller, for
The Innocence Project, amicus curiae, submitted a brief.


    [1] Justices Spina and Duffly participated in the deliberation
on this case prior to their retirements.

BOTSFORD, J.  On February 19, 1986, Joseph Bottari and Frank Chiuchiolo were shot multiple times and killed in the North End section of Boston.  Louis Costa, Paul Tanso, and the defendant in this appeal, Frank DiBenedetto, were charged with their murders.  On February 3, 1994, after a second trial, a jury found the defendant and Costa guilty of murder in the first degree of Bottari and Chiuchiolo.[2,3]  See Commonwealth v. DiBenedetto, 427 Mass. 414, 415 (1998) (DiBenedetto II).[4]

In 2005, the defendant filed a motion for a new trial on the basis of newly discovered evidence, namely, deoxyribonucleic

---

[2] Louis Costa and the defendant were first tried together in 1988; each was found guilty of murder in the first degree.  The convictions, however, were reversed by this court based on the erroneous admission at trial of the uncross-examined deposition testimony of Richard Storella, a significant witness for the Commonwealth.  See Commonwealth v. DiBenedetto, 414 Mass. 37, 38-44, 50 (1992) (DiBenedetto I).

[3] In 1988, Paul Tanso was tried separately from Costa and the defendant as a result of a successful motion to sever his case.  See Commonwealth v. DiBenedetto, 458 Mass. 657, 659 n.7 (2011) (DiBenedetto III).  Tanso was initially convicted on two counts of murder in the first degree, but his convictions were reversed by this court based on the erroneous admission at trial of Storella's deposition testimony, see note 2, supra. Commonwealth v. Tanso, 411 Mass. 640, 641-642, cert. denied, 505 U.S. 1221 (1992).  In 1994, Tanso was retried and found not guilty.  See DiBenedetto III, supra.

[4] The defendant filed in the United States District Court for the District of Massachusetts a petition for a writ of habeus corpus, which was denied, DiBenedetto v. Hall, 176 F. Supp. 2d 45, 66 (D. Mass. 2000), and the United States Court of Appeals for the First Circuit affirmed the denial.  DiBenedetto v. Hall, 272 F.3d 1, 13 (1st Cir. 2001), cert. denied sub nom. DiBenedetto v. Spencer, 535 U.S. 1024 (2002).

acid (DNA) evidence showing that both victims were excluded as contributors to the DNA that was found on the defendant's sneakers.  On January 12, 2009, the motion judge, who also was the trial judge, denied without a hearing the motion in a written memorandum of decision and order.  The defendant filed a gatekeeper petition pursuant to G. L. c. 278, § 33E (§ 33E), and on June 16, 2009, a single justice of this court granted leave to appeal the denial of the motion for a new trial to the full court.  Following briefing and argument, this court vacated the order denying the motion and remanded the matter to the Superior Court for further findings.[5]  See Commonwealth v. DiBenedetto, 458 Mass. 657, 659, 670 (2011) (DiBenedetto III).[6]

_____

[5] We stated that, on remand, if the Commonwealth so requested, an evidentiary hearing would be appropriate to inquire into the scientific reliability of the conclusions stated by the defendant's deoxyribonucleic acid (DNA) expert. See DiBenedetto III, 458 Mass. at 671.  We added that the Commonwealth also might seek to challenge whether the DNA evidence qualified as newly discovered evidence.  See id. at 671 n.20.

[6] Louis Costa, who was tried with the defendant in both previous trials, had also filed a motion for a new trial in 2005.  His and the defendant's motions were considered together in the Superior Court by the motion judge and thereafter by this court in DiBenedetto III.  Following remand to the Superior Court pursuant to the rescript in DiBenedetto III, 458 Mass. at 672-673, the defendant's case and Costa's case were separated, with the motion judge retaining jurisdiction only of the case against the defendant.  At the time of the murders, Costa was under the age of seventeen, and thus, after our decision in Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 658-659 (2013), S.C., 471 Mass. 12 (2015), Costa was entitled to be resentenced to a sentence granting him the

Following remand, the Commonwealth did not seek an evidentiary hearing. The defendant submitted additional affidavits, one from an expert in DNA analysis who confirmed the conclusions reached by the defendant's first DNA expert in 2004, and another from a separate expert concerning the reliability of eyewitness identifications. After a nonevidentiary hearing, the motion judge again denied the defendant's new trial motion, explaining his reasons in a further memorandum of decision and order.

The defendant filed a notice of appeal and a petition in the county court to reinstate his appeal in the full court. The Commonwealth opposed the petition on both procedural and substantive grounds, arguing that the defendant was required to seek leave to appeal from the renewed denial of his new trial motion through a second gatekeeper petition under § 33E. A single justice of this court agreed with the Commonwealth, treated the defendant's petition to reinstate his appeal as a second gatekeeper petition, and denied the petition, concluding that the defendant did not present a "substantial" claim that

---

possibility of parole. See Commonwealth v. Costa, 472 Mass. 139, 140-141 (2015). Because only the defendant is before this court in the present appeal, we discuss only the defendant's motion for a new trial, and its course through the Superior Court and this court.

warranted review by the full court.[7]  In September, 2015, after a series of additional motions and proceedings in the county court, the defendant filed a motion in the full court to reinstate his appeal.  The court thereafter ordered briefing "on the question whether the defendant is entitled to reinstatement of his appeal and on the merits of the defendant's underlying claims."

In the discussion that follows, we consider first whether the defendant is entitled to have his original appeal to the full court from the denial of his motion for a new trial reinstated following the court's remand for further findings. We conclude that reinstatement of the appeal is appropriate, even though the court did not expressly retain jurisdiction.  We then consider the defendant's claim that he is entitled to a new trial based on the new DNA evidence, and conclude that the motion judge did not abuse his discretion in denying the defendant's motion.[8]

1.  Background.  The facts of this case are set out in some detail in DiBenedetto II, 427 Mass. at 416-420, and DiBenedetto

---

[7] Pursuant to G. L. c. 278, § 33E, a single justice of this court may grant leave to appeal from the denial of a motion for a new trial to the full court where the gatekeeper petition "presents a new and substantial question which ought to be determined by the full court."

[8] We acknowledge the amicus brief submitted by The Innocence Project in support of the defendant.

III, 458 Mass. at 658-663. We summarize them here. Around 9:30 P.M. on February 19, 1986, a Boston police officer found the bodies of the victims in Slye Park in the North End section of Boston. Chiuchiolo had been shot seven times, including five shots to the head, and Bottari had been shot sixteen times, including six shots to the head. Three different guns had been used to shoot each victim: two .380 caliber semiautomatic pistols and a .22 caliber revolver. When police responded to the scene shortly after the shooting incident ended, the victims' bodies were surrounded by pools of blood and multiple spent shell casings.

Joseph Schindler, who lived in an apartment building on one side of Slye Park, observed much of the shooting incident as it took place in the park below him. He testified that around 9:30 P.M. that evening, he was sitting in his third-floor apartment, from which he had an unobstructed view of the park. He heard four or five "'cracks or pops' that he thought were fireworks," DiBenedetto III, 458 Mass. at 660, and he looked out his window and "saw orange-red flashes in the area of the hand of a man whom he later identified as [the codefendant,] Costa." Id., quoting DiBenedetto II, 427 Mass. at 416. Schindler saw five men running in the park, two of whom fell to the ground at separate times in different locations. Each of the other three men, the shooters, left the park and walked toward Boston Harbor

after each descended a series of staircases on the other side of the park. In the course of their descent, each shooter at one point walked facing toward Schindler so that he could observe their faces and bodies -- their front profile -- one at a time. However, before the last person -- later identified by Schindler as the defendant -- descended all the sets of stairs and left the park, he stopped and turned around, returning to the area where Chiuchiolo's body lay on the ground. This individual, whom we refer to as the third shooter, "stood bent at the waist so that he was just a few inches from the head area of the prone [Chiuchiolo]. Schindler then saw four to six flashes accompanied by the same sound he had initially heard." DiBenedetto III, 458 Mass. at 660 & n.8. The park was lit by artificial lights, and Schindler estimated that he observed the shooting incident and the three shooters in the park over the course of a three- to five-minute period, including a three- to five-second period during which the defendant stood facing him as he was walking down the stairs and leaving the park; Schindler testified that his ability to identify the defendant's face principally depended on this three- to five-second observation.

After the three shooters left Slye Park, Schindler telephoned the police, who reported to the scene and interviewed him regarding his observations. That night, Schindler provided

descriptions of the three men whom he saw leaving the park, descriptions that were not "entirely accurate," id., but the following day, Schindler went to the police station and informed police officers that, given the opportunity, he could identify the three men.[9] He later identified the assailants as DiBenedetto, Costa, and Tanso on multiple occasions, including identifying each man individually in a separate lineup conducted at the police department, each in pretrial court room proceedings, and Costa and the defendant at trial. Id.

Richard Storella, who was at one time a close friend of the defendant and Costa, testified as follows. Bottari and Chiuchiolo told him to set up a "drug buy" with the defendant, during which they would rob the defendant of the drugs. Storella set up the purported drug buy meeting for around 9 P.M. on February 19, 1986, but he first informed the defendant of the victims' intention to steal the drugs. With that knowledge, the defendant formed a plan with Costa, Tanso, and Storella to meet with the victims in Slye Park and shoot and kill them on sight. Around 8 P.M. on February 19, these four men met at Enrico Ponzo's house and readied their weapons and ammunition,

---

[9] Joseph Schindler testified at trial that when he was initially interviewed by police following the incident, he told the police that he was not able to make affirmative identifications of the three assailants because he saw that his wife was very concerned about the prospect of his being involved in the case.

including a .22 caliber revolver that Storella had retrieved and given to Tanso, and hollow point bullets. Storella then accompanied the men to Slye Park but remained outside the park itself, from where he witnessed each of the three men fire shots at the victims when the victims arrived; Storella ran out of the park as DiBenedetto ran toward Chiuchiolo. The following day, Storella heard Costa, Tanso, and the defendant talking about the incident. During their conversation, each of them stated that he had shot each victim. DiBenedetto III, 458 Mass. at 659, quoting DiBenedetto II, 427 Mass. at 415-416. Between Storella's first interview with the police and the 1994 trial, however, he had given five "different and inconsistent accounts of what he had seen that night, including one in which he claimed that he himself had been one of the murderers." DiBenedetto III, supra, quoting DiBenedetto II, supra. Storella had been granted immunity from prosecution, including prosecution for murder, in exchange for his "truthful" testimony against the other three. DiBenedetto III, supra.

The defendant's motion for a new trial centers on a pair of Nike sneakers that were introduced in evidence for the first time during the 1994 trial.[10] Schindler testified that the third shooter, i.e., the defendant, "wore white Nike brand sneakers

---

[10] The Commonwealth did not introduce the sneakers in evidence at the defendant's first trial. See DiBenedetto III, 458 Mass. at 658.

that had become 'grayish with age,' identifiable by the trademark red 'swoosh' design on them." DiBenedetto III, 458 Mass. at 660. When the defendant was arrested in his apartment four days after the shooting incident, he was wearing a pair of white Nike sneakers that Schindler identified at trial as "similar" to the shoes the third shooter was wearing on the night of the incident. Id. We repeat here our description in DiBenedetto III of the testing of the Nike sneakers:

> "At the time DiBenedetto's sneakers were seized in 1986, they were sent to the Boston police crime laboratory (crime lab) for testing. A senior criminalist employed by the crime lab visually examined the sneakers for the presence of blood, but observed nothing remarkable and specifically observed no stains that could be tested for the presence of blood. No chemical testing of the sneakers was conducted at that time.

> "On December 31, 1993, on request by the prosecutor and days before the retrial of DiBenedetto and Costa was scheduled to begin, David L. Brody, the director of the crime lab, performed a preliminary test for the presence of blood on the sneakers. The test was conducted with the use of the chemical phenolphthalein and hydrogen peroxide, an oxidizing agent. Brody's test of the right sneaker yielded no positive results, but an outside edge of the sole of the left sneaker tested positive, meaning the result indicated the presence of blood. George Abbott, an expert retained by the defendant, however, was unable to replicate this result on the left sneaker, but identified a small area on the sole of the right sneaker that tested positive.

> "The type of phenolphthalein test performed by Brody and Abbott may return a false positive if applied to certain plant substances, referred to as 'plant peroxidase.' Moreover, the test does not distinguish between human blood and any other animal blood. It is only possible to make that type of distinction by performing one or more additional, confirmatory tests for the presence of human blood, but none was performed. Immediately before

the second trial, the defendants' counsel moved to suppress any evidence relating to the phenolphthalein test results and in effect renewed the motion at trial; their argument, made most forcefully at trial, was that the evidence as presented did not allow a reasonable inference that any blood on DiBenedetto's sneakers was in fact the blood of 'any relevant party' present at Slye Park on February 19, 1986. The motion to suppress was denied, the defendants' argument on the issue at trial overruled, and the jury heard evidence from Brody and from Abbott about the testing of the sneakers for blood and the respective experts' opinions concerning the results of the testing. . . .

". . .

"In 2004, Janet Hanniman, a forensic serologist retained by the defendants, reanalyzed DiBenedetto's sneakers. She was able to extract DNA evidence from the area of the left sneaker that Brody testified had yielded a presumptive positive result for the presence of blood; she also extracted DNA from stains on other specific portions of the right and left sneakers. She found that the DNA yielded 'weak and incomplete genetic profiles that were mixtures from at least three people.' Based on her examination, she excluded both Chiuchiolo and Bottari as contributors to that DNA. Hanniman opined that if the blood of either victim had been the cause of the positive preliminary tests completed in 1993-1994, DNA contained in that blood also would have been present on the sneakers; and that if that DNA were present, it would still be detectable in 2004. Hanniman could not confirm whether blood was the source of the DNA she identified, but she could not exclude it as a possibility."

DiBenedetto III, 458 Mass. at 661, 663.

Following DiBenedetto III, on remand to the Superior Court, the defendant submitted an affidavit from Carll Ladd, a forensic scientist who is the supervisor of the DNA unit in the State of Connecticut's forensic laboratory. Ladd confirmed Hanniman's conclusions that (1) DNA profiles were found in seven different locations on the sneakers, including the two locations that were

phenolphthalein positive in 1994; (2) the profiles consisted of DNA mixtures derived from multiple people; (3) the victims were excluded as contributors to any of the mixtures; and (4) if either of the victims' DNA had been deposited on the sneakers in 1986, that DNA would still be detectable on the sneakers when tested in 2004. The defendant also submitted an affidavit of a professor of psychology at Tufts University, Samuel Sommers, on the fallibility of eyewitness identifications. Sommers opined on factors that present risks concerning the accuracy of eyewitness identifications generally and concluded that "[m]ultiple risk factors for mistaken eyewitness identification and inflated eyewitness confidence were present in Schindler's identifications of DiBenedetto and Costa." As indicated, following a nonevidentiary hearing, the judge again denied the defendant's motion for a new trial.

Discussion. 1. Reinstatement of the defendant's appeal. General Laws c. 278, § 33E, governs not only direct appeals of convictions of murder in the first degree, but also motions for a new trial in such cases, whether filed before the defendant's direct appeal has been decided or after the entry of the rescript by this court. With respect to motions for a new trial filed after rescript, § 33E provides:

> "If any motion is filed in the superior court after rescript, no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a

single justice of the supreme judicial court on the ground that it presents a new and substantial question which ought to be determined by the full court."

The defendant's motion for a new trial at issue here was filed after the rescript of his direct appeal from the 1994 conviction in DiBenedetto II. A single justice allowed his gatekeeper petition, impliedly concluding that it raised a "new and substantial question which ought to be determined by the full court." Commonwealth v. Ambers, 397 Mass. 705, 707 (1986). In DiBenedetto III, however, we did not reach the merits of the question raised -- whether the new DNA evidence relating to the sneakers "cast[] real doubt on the justice of the conviction," Commonwealth v. Grace, 397 Mass. 303, 305 (1986) -- because we determined that it was "necessary to remand the case for further findings by the motion judge concerning the proffered DNA evidence and its importance to the defendant['s] claim [that he] was not the third shooter in light of the evidence presented at trial." See DiBenedetto III, 458 Mass. at 670. We added that "[a] remand [was] particularly appropriate . . . because of the fact that the motion judge was the trial judge with a thorough knowledge of the trial proceedings . . . who had the opportunity to observe the trial witnesses firsthand." Id. at 670-671. Accordingly, we vacated the motion judge's order denying the defendant's motion for a new trial and remanded the case to the Superior Court for further consideration of the motion in a

manner consistent with our opinion. Id. at 672-673. We did not explicitly state that we were retaining jurisdiction.[11]

We disagree with the Commonwealth's position that because we did not expressly retain jurisdiction in remanding the case to the Superior Court, we did not intend to do so, and that, therefore, the defendant could only seek to appeal from the judge's further denial of the motion by filing a second gatekeeper petition under § 33E. Rather, we conclude that the second gatekeeper petition was not required here because a single justice already determined in 2009 that the defendant's motion for a new trial raised a new and substantial issue worthy of consideration by the full court. We did not decide that issue in DiBenedetto III, but instead remanded the case to the Superior Court for further hearing and findings that would enable us to better do so. Now that the judge has held the hearing and rendered a further decision, the defendant is entitled to have us decide that issue.[12] Cf. Commonwealth v.

---

[11] Compare Commonwealth v. Greineder, 464 Mass. 580 (2013); Commonwealth v. Lennon, 463 Mass. 520 (2012); Commonwealth vs. Mazza, SJC-11363.

[12] Contrary to the Commonwealth's claim, the merits issue the defendant raises here is not "wholly new," but the same issue he originally raised in his motion for a new trial: whether he is entitled to a new trial based on the new DNA evidence, where the Commonwealth and the judge in effect accepted that the DNA evidence was newly discovered.

Geraway, 364 Mass. 168, 175-176 (1973). Cf. also Commonwealth v. Hurley, 391 Mass. 76, 78-79 (1984).

2. Motion for a new trial. To prevail on a motion for a new trial on the basis of newly discovered or newly available evidence, the defendant must meet a two-part test. He must demonstrate, first, that the evidence was previously unknown to him or not reasonably discoverable before trial and, second, that the evidence "casts real doubt on the justice of the conviction." Grace, 397 Mass. at 305. See Commonwealth v. Cowels, 470 Mass. 607, 616 (2015). In this case, the Commonwealth, although afforded a specific opportunity to do so, see DiBenedetto III, 458 Mass. at 664 n.11, 671 n.20, has not contested that the DNA analysis performed by Hanniman in 2004 constitutes newly discovered evidence. We therefore accept, as did the judge, that the defendant satisfies the first prong of the Grace test. The issue is whether he has satisfied the second.

The defendant argues that, for two reasons, the newly discovered DNA evidence, indicating that both victims were excluded as possible sources of the DNA mixture contained in blood found on the Nike sneakers, casts real doubt on the justice of his conviction. The first, and most significant in the defendant's view, is that the evidence constitutes "powerfully exculpatory evidence" because it tends to show that

the defendant could not have been the third shooter in the circumstances of the case.[13]  The second reason is that the same DNA evidence would likely render inadmissible the evidence of the phenolphthalein test results as evidence tending to show that the victims' blood was on the sneakers, and more importantly, the new DNA evidence would foreclose the Commonwealth from arguing that the defendant's sneakers, with the blood, provided strong physical evidence that supported and reinforced Schindler's identification of the defendant as the third shooter.

New evidence will "cast[] real doubt on the justice" of a defendant's conviction if there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial.  Grace, 397 Mass. at 306.  The standard is not whether the verdict in fact would have been different, but whether there is a meaningful risk that it would have been. See Commonwealth v. Sullivan, 469 Mass. 340, 350-351 (2014),

---

[13] Schindler testified that the third shooter was standing essentially over the prone body of Chiuchiolo with his gun just inches away from Chiuchiolo's head and then fired the gun repeatedly.  By the time the police arrived, there were large pools of blood on the ground around Chiuchiolo's head.  The defendant argues, therefore, that if he were the third shooter and had been wearing the subsequently seized Nike sneakers during the killings, certainly the sneakers would have the blood of one or both victims on them.

quoting <u>Grace</u>, <u>supra</u>.  Accord <u>Cowels</u>, 470 Mass. at 617.[14]  And

because "[s]uch fact-specific analysis requires a thorough

---

[14] In a number of recent cases, we have considered
arguments, similar to the defendant's second argument -- that a
new trial was required because of newly discovered or newly
available evidence that would have rendered inadmissible certain
evidence on which the Commonwealth relied at trial.  See
<u>Commonwealth</u> v. <u>Cameron</u>, 473 Mass. 100 (2015); <u>Commonwealth</u> v.
<u>Cowels</u>, 470 Mass. 607 (2015); <u>Commonwealth</u> v. <u>Sullivan</u>, 469
Mass. 340 (2014).  In <u>Cowels</u>, we discussed how the <u>Grace</u> test
applies to such a case:

>     "In the typical case, where a defendant argues on the
> basis of newly discovered exculpatory evidence that was not
> presented at the original trial, we ask 'whether the new
> evidence <u>would probably have been</u> a real factor in the
> jury's deliberations' had it been presented [emphasis
> supplied].  <u>Commonwealth</u> v. <u>Grace</u>, 397 Mass. at 306.  In
> this case, where the defendants argue on the basis of a
> newly available analysis that likely would have rendered
> inculpatory evidence presented at the original trial
> inadmissible, we ask whether that inculpatory evidence
> 'likely <u>was</u> a "real factor" in the jury's deliberations
> such that its elimination would cast real doubt on the
> justice of the defendant's conviction' [emphasis supplied].
> <u>Commonwealth</u> v. <u>Sullivan</u>, 469 Mass. 340, 350 (2014). . . .
> If we conclude that the subsequently eliminated inculpatory
> evidence likely did play an important role in the jury's
> deliberations, then we must conclude that there is '"a
> substantial risk that the jury would have reached a
> different conclusion" if it had not been admitted at
> trial.'"

<u>Cowels</u>, <u>supra</u> at 618.  As we explained in <u>Cowels</u>, although the
question asked to determine whether newly discovered evidence
entitles the defendant to a new trial may differ, depending on
the potential effect of that evidence on the case -- i.e., would
the new evidence add exculpatory evidence or remove inculpatory
evidence -- the focus of the test is the same:  whether the
evidence probably would have been a "real factor" in the jury's
decision, such that there is a substantial risk that the jury
would have reached a different conclusion had the evidence been
admitted at trial (or excluded, as the case may be).  <u>Id</u>. at

knowledge of trial proceedings . . . , we afford special deference to the rulings of a motion judge who was also the trial judge" (citation omitted).  Sullivan, supra at 351.

The motion judge in this case, who was also the trial judge, rejected both of the defendant's arguments.  The judge questioned the exculpatory value of the new DNA evidence insofar as, in his view, the jury reasonably could have inferred either that the defendant was not wearing the same Nike sneakers on the night of the killings as he was when arrested four days later, or that the defendant had wiped the sneakers clean of virtually all the blood that may have been on them; the judge also stated that, in any event, because the serologist Hanniman had only tested a discrete number of areas on the sneakers, the defendant had not demonstrated the "complete absence" of the victims' DNA from the sneakers. As for the defendant's second argument, the judge restated the conclusion he had reached when he originally denied the defendant's motion for a new trial in 2009:  his observation of the first trial as it proceeded persuaded him that the allegedly inculpatory blood-on-the-sneakers evidence had been of marginal value to the prosecution and "was not of significant consequence at trial to the jury's assessment of the defendant's guilt."  The judge's principal reason for rejecting

---

617-618.  See Commonwealth v. Tucceri, 412 Mass. 401, 413 (1992), citing Grace, 397 Mass. at 306.

the defendant's claims, however, was tied to his assessment of the strength of the Commonwealth's case, and, in particular, the exceptional (in his view) strength and credibility of the identification evidence supplied by Schindler -- an identification that was corroborated by the other eyewitness, Storella, who, despite having provided many versions of the events, undisputedly knew the defendant (as well as Costa and Tanso) and had consistently identified the defendant and Costa as two of the three shooters.

The defendant challenges the judge's decision as based on a mischaracterization of trial evidence and speculation as to the inferences the jury might draw if the new DNA evidence had been presented at trial. On mischaracterization, he argues, for example, that the judge repeatedly stated that Schindler viewed the defendant for three to five minutes, and that the judge declined to give any weight to Schindler's critical testimony that his (Schindler's) ability to identify the defendant was based on a three- to five-second observation of the defendant as he stood on a well-lit set of stairs leading out of the park. Schindler certainly did testify about the importance of the three- to five-second period of observation of the defendant's face to his (Schindler's) ability to identify the defendant, but Schindler also testified that he was "accumulating" information about the defendant during the entire three- to five-minute

period he was observing the defendant and the other men in the park. In that sense, the three- to five-minute period was certainly relevant to Schindler's capacity to identify the defendant, and we cannot say the judge abused his discretion in focusing on this longer period in assessing the strength of Schindler's identification testimony.[15]

With respect to speculation, the defendant points to the judge's proffered reasons that the jury would not likely have given much significance to the new DNA evidence if it had been available at trial, such as the judge's assumption that the jury reasonably could have inferred that on the night of the killings, the defendant was wearing a pair of sneakers different from the ones he was wearing when he was arrested four days later, or that the defendant washed his sneakers prior to being

---

[15] Another example provided by the defendant of the alleged misrepresentation of the evidence by the judge concerns the distance from Schindler's third-floor study window to the particular location in Slye Park where he observed each shooter's face when each shooter was heading out of the park and toward Boston Harbor. There was evidence that the distance measured eighty-eight feet and, although Schindler testified based on a chalk depicting his apartment building and the park that he was "willing to believe" that the distance was approximately ninety feet, he later reaffirmed that his estimation of the distance was fifty feet; the judge's decision focuses on the fifty feet. There was no evidence presented at trial as to what specifically could or could not be seen at fifty versus eighty-eight feet, and the jury also took a view and observed these locations for themselves. In the circumstances of this case, the thirty-eight foot difference between the measured distance and Schindler's estimation does not appear to be of real significance in assessing the correctness of the judge's decision.

arrested.  We agree that the judge's reasoning is based on what are necessarily speculative assumptions because, by definition, the newly discovered evidence was not admitted at trial and not considered by the jury, but for reasons discussed infra, we conclude that the judge did not abuse his discretion in deciding that the exculpatory value of the new DNA evidence is far less significant than the defendant claims that it is.

The defendant contends that the judge, in substance, ignored the factors that may have weakened or even undermined the reliability of Schindler's identification of the defendant, including -- as emphasized in the affidavit submitted by Sommers -- the repeated postevent exposure to information and evidence that, in Sommers's opinion, led to an evolving specificity of Schindler's identification over time.[16]  See generally Supreme Judicial Court Study Group on Eyewitness Evidence:  Report and Recommendations to the Justices (July 25, 2013) (study group report).  The judge, however, had the benefit of hearing and observing Schindler testify in person, and also specifically noted that he was aware of the factors that may affect eyewitness identification mentioned by Sommers.  We cannot conclude that the judge abused his discretion in declining to

---

[16] The defendant points out that Schindler did not testify that the sneakers he observed the third shooter wearing were Nike sneakers with a trademark red swoosh until the second trial, after he had viewed a pair of dirty white Nike sneakers with a red swoosh in an evidence bag in the prosecutor's office.

question the reliability of Schindler's identification based on such factors. It is also the case that the judge's instructions to the jury, which predated the study group report and our decision in Commonwealth v. Gomes, 470 Mass. 352 (2015), and its progeny, were faithful to the identification principles set out in Commonwealth v. Rodriguez, 378 Mass. 296, 310-311 (1979) (Appendix), S.C., 419 Mass. 1006 (1995), and included an instruction on the possibility of an honest but mistaken identification in accordance with Commonwealth v. Pressley, 390 Mass. 617, 619-620 (1983). See Commonwealth v. Navarro, 474 Mass. 247, 254-255 (2016).

Motions for a new trial are addressed to the "sound discretion" of the trial judge. DiBenedetto III, 458 Mass. at 663-664. See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).[17] Having been the trial judge, the motion judge here, as he was entitled to do, clearly made "use of his knowledge of

---

[17] We restated the standard for judging an abuse of discretion in L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), as follows:

"An appellate court's review of a trial judge's decision for abuse of discretion must give great deference to the judge's exercise of discretion; it is plainly not an abuse of discretion simply because a reviewing court would have reached a different result. . . . [A] judge's discretionary decision constitutes an abuse of discretion where we conclude the judge made 'a clear error of judgment in weighing' the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" (citations omitted).

what occurred at trial." Commonwealth v. Kirwan, 448 Mass. 304, 315 (2007). Although he certainly could not know what was in or on the minds of the jurors who decided the case, the judge was entitled to assess the credibility of the witnesses at trial, including in particular Schindler, who testified over the course of four days. In the judge's view, very clearly, this was a case in which "[t]he strength of the case against [the] defendant . . . weaken[ed] the effect of evidence which is admittedly newly discovered." Grace, 397 Mass. at 306. Considering the defendant's two claims about the impact of the new DNA evidence in conjunction with our own full review of the trial record, we cannot conclude that the judge's view reflects a "clear error of judgment." L.L., supra.

The defendant's claim that the new DNA evidence was "powerfully exculpatory" is premised on the belief that the third shooter was highly likely to have gotten one or both of the victims' blood on his sneakers, and that the absence of any DNA from the victims was strong evidence that the defendant was not the third shooter. The factual basis of this premise is not self-evident from the record.[18] Moreover, the exculpatory value

---

[18] Although photographs showed pools of blood around the victims by the time the police arrived at and secured the crime scene and photographed the victims lying on the ground, there was no evidence as to whether or in what amount blood was present when the third shooter came back to where Chiuchiolo was lying and fired the additional shots at Chiuchiolo, and no

of the new DNA evidence is diminished by (1) the DNA examiners'
opinions that the DNA evidence found on the sneakers was small
and, according to the serologist, consisted of "weak and
incomplete genetic profiles," see DiBenedetto III, 458 Mass. at
663, 671; and (2) the fact that the sneakers had been seized by
the police approximately eighteen years before they were tested
and had not been stored in any type of scientifically protective
manner.[19]

The defendant's separate claim is that the prosecutor's use
of the phenolphthalein test evidence against him at trial and
particularly during her closing argument was likely a real
factor in the jury's decision to find him guilty, and the DNA

---

evidence concerning likely blood spatter pattern relating to
those additional shots.  It is also the case that the third
shooter may have taken caution not to step in the areas where
blood was visible, and that, as the judge hypothesized, if the
defendant was the third shooter and was wearing the Nike
sneakers at the time of the killings, he may have wiped any
blood off the sneakers by the time they were seized after his
arrest four days later.

[19] The defendant's experts, Janet Hanniman and Carll Ladd,
stated in their affidavits that DNA, if deposited on the shoes
on the night of the shooting, would be present eighteen years
later, but Ladd went on to clarify that that conclusion was
based on the assumption that the sneakers were properly stored.
The lack of proper storage, he opined, could cause more
significant degrading of the DNA contained in the sneakers.  He
also stated that if the sneakers had been washed after the
victims' blood was transferred to one or both of them, the
survival of a detectable amount of DNA would depend on multiple
factors, "including how much DNA was originally present, how
much washing was done, and whether bleach, soap or another
detergent was used."

evidence would have prevented the prosecutor from making such an argument. We have reviewed the prosecutor's closing argument, including a videotape of the argument submitted by the defendant. Near the end of her lengthy closing, the prosecutor does argue forcefully about the value of the phenolphthalein test evidence as concrete physical evidence corroborating the eyewitness testimony.[20] However, the closing argument, taken as a whole, was not built around or centered on this point, and it was also clearly not the most forceful point. The prosecutor, rather, focused primarily on the credibility of the identifications of the defendant and his codefendant, Costa, made by Schindler, and most particularly on the fact that Schindler's detailed observations about the events in the park and the actions of the shooters corresponded with specific details supplied by Storella, and both of these witnesses' testimony corresponded with details testified to by the medical examiner -- an effective triangulation of consistent evidence.

In sum, we accept the judge's conclusion, reflected in his denial of the motion for a new trial, that this is not a case in which "justice may not have been done." Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001).

---

[20] See DiBenedetto III, 458 Mass. at 661-662, where this portion of the prosecutor's closing argument is quoted.

<u>Conclusion</u>.  The order denying the defendant's motion for a new trial is affirmed.

<u>So ordered</u>.